**Robert and Heather AVILA, legal representatives of a minor child, Taylor AVILA, Petitioners,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 05–685V.

United States Court of Federal Claims.

Dec. 22, 2009.

---

Robert T. Moxley, Cheyenne, Wyoming, for petitioners.

Katherine C. Esposito, Washington, DC, with whom was Assistant Attorney General Tony West, for respondent.

## MEMORANDUM OPINION AND ORDER

MILLER, Judge.

This matter is before the court on petitioners' motion for review of a special master's decision on attorneys' fees filed on July 27, 2009, and petitioners' motion for interim attorneys' fees filed on October 5, 2009, following petitioners' unsuccessful compensation claim and partial award on their application for attorneys' fees and costs in the amount of $9,882.89 pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa–10 to –34 (2006) (the "Vaccine Act"). The principal issue on review is whether the special master abused his discretion when he declined to enhance the award of attorneys' fees because he deemed their showing insufficient that the work was performed in a legal market where counsel's hourly rates typically would be higher for comparable legal work.[1] Argument is deemed unnecessary.

### FACTS

Robert and Heather Avila, legal representatives of Taylor Avila, a minor child ("petitioners"), on June 22, 2005, filed their Vaccine Act claim alleging that a DtaP vaccination caused Taylor to suffer a "seizure syndrome." *Avila v. Sec'y of Health & Human Servs.*, No. 05–685V, 2008 WL 2683298, at *1 (Fed. Cl. Spec. Mstr. June 18, 2008) (*"Avila I"*). In a decision on liability dated June 18, 2009, Special Master George L. Hastings found that Taylor's in-

---

1. 42 U.S.C. § 300aa–15(e)(1), provides, in pertinent part:

    If the judgment of the United States Court of Federal Claims on such a petition does not award compensation, the special master or court may award an amount of compensation to cover petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought.

jury did not fall within the Vaccine Injury Table and that petitioners could not prove that Taylor's injuries were "actually caused" by the vaccine. *Id.* (noting that the "records do not contain a medical expert's opinion indicating that any of Taylor's problems were vaccine-caused"). Consequently, the special master denied petitioners' claim for compensation. *Id.* Petitioners do not appeal this decision.

On October 8, 2008, petitioners filed a Petition for Reimbursement of Attorneys' Fees and Costs at "Forum" Rates (the "Fee Application"). Petitioners seek compensation for their attorney, Robert T. Moxley, including members of his legal team and staff. Compensation for Mr. Moxley is sought at hourly rates ranging from $405.00 to $465.00. Mr. Moxley's associates, Julie Hernandez and Kirk Morgan, are billed at hourly rates of $195.00, and his paralegal, Carol Gollobith, at an hourly rate of $85.00. The total fees claimed are $14,558.89, including $3,456.39 in costs.[2]

The special master's decision of June 26, 2009 awarded petitioners $9,882.89 in attorneys' fees, including $3,456.39 in costs. *See Avila v. Sec'y of Health & Human Servs.*, No. 05–685V, 2009 WL 2033063, at *5 (Fed. Cl. Spec. Mstr. June 26, 2009) ("*Avila II*"). He applied the recent precedential attorneys' fees opinion in *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343 (Fed.Cir.2008). The United States Court of Appeals for the Federal Circuit concluded in *Avera* that the "forum rate" should be used to determine the appropriate market rate for attorneys' fees in Vaccine Act cases. *See Avera*, 515 F.3d at 1349. This paradigm utilizes rates charged by attorneys of comparable skill, experience, and reputation practicing in the District of Columbia. *See id.* at 1348–49. The *Avera* court also held that an exception to the "forum rule" is triggered " 'where the bulk of [an attorney's] work is done outside the jurisdiction of the court and where there is a *very significant* difference in compensation favor-

ing D.C.' " *Id.* at 1349 (alteration in original) (*quoting Davis County Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. U.S. Envtl. Prot. Agency*, 169 F.3d 755, 758 (D.C.Cir.1999)). The special master found that the *Davis* exception to the form rate (or forum rule) applied to petitioners' fee request. *Avila II*, 2009 WL 2033063, at *2.

Of central importance to the special master's ruling regarding the *Davis* exception was his conclusion that this ruling "follows directly from the outcome in *Avera*," in which the Federal Circuit determined that the *Davis* exception to the forum rule applied. *Id.* The special master explained that *Avera* involved the same attorney, Mr. Moxley. *Id.* As was the case in *Avera*, the special master found that Mr. Moxley performed all of his work on the case in Cheyenne, Wyoming, where the prevailing market rate is "significantly" lower than in the District of Columbia. *Id.* Thus, the special master reasoned that "the *Davis* exception appropriately applies to this case, so that the legal services provided in this case must be compensated at the Cheyenne rates." *Id.*

The special master considered petitioners' argument that *Avera* is factually distinguishable because the work performed in the case at bar involved "complex federal litigation," which engages a higher-priced legal market when these services are obtained in Cheyenne—including hourly rates comparable to the District of Columbia. *Id.* at *3 ("[P]etitioners seem to argue that the *Avera* court erred concerning a *factual matter* in its conclusion that the prevailing rates in Cheyenne were significantly lower than in the District of Columbia. Petitioners contend that as a *factual matter* the prevailing rates in Cheyenne for the legal services *of the type provided to petitioners in this case* are in fact similar to prevailing rates in the District of Columbia for similar services.").

The special master deemed the "only significant item of evidence" proffered by peti-

---

**2.** Included in petitioners' costs is the fee from Dr. Marcel Kinsbourne, who charged $1,250.00 for two hours reviewing medical records and one-half hour conferring with Mr. Moxley. PX 25, at 2, 8. Based on the records submitted to the special master, Dr. Kinsbourne was the only ex-

pert consulted in this case. *See id.* It does not appear that Dr. Kinsbourne prepared an expert report, and no such report was filed. Nor was testimony taken from Dr. Kinsbourne. Review was not sought regarding the award of costs.

tioners to be the affidavit of Cheyenne attorney Donald I. Schultz. *See id.* at *3. While Mr. Schultz represented that he and other Cheyenne attorneys of whom he has "personal knowledge" practice in the area of "complex federal litigation," commanding rates between $375.00 and $405.00 an hour and whose experiences are "akin" to Mr. Moxley's, the special master found Mr. Schultz's affidavit "suffers from serious deficiencies." *Id.* (internal quotation omitted). Specifically, the special master faulted Mr. Schultz for failing to disclose the specific rates that he charges or to identify the "names, legal experience, and reputations of the individuals" who receive the higher rates. *Id.* "Therefore, even assuming that certain Cheyenne attorneys do in fact routinely receive such hourly rates for complex federal litigation in the Cheyenne area, I have no way to determine if those unnamed individuals truly are comparable to Mr. Moxley in their skill, experience, and reputation." *Id.* (internal quotations omitted).

The special master viewed the declarations provided by Mr. Moxley himself to be the most persuasive and reliable evidence on the prevailing rates in Cheyenne for "services of the type provided by Mr. Moxley in this case." *Id.* at *4. The special master found that Mr. Moxley submitted evidence of his work involving a substantial amount of non-Vaccine Act litigation that the special master credited as "complex federal litigation." *See id.* (*citing* PX 9 ¶¶ 4–6) (describing Mr. Moxley's work before various Wyoming federal trial courts in cases involving civil rights, medical malpractice, Americans with Disabilities Act, Rehabilitation Act, and Clean Air Act litigation). That declaration also stated that Mr. Moxley charged his clients in Wyoming between $200.00 to $250.00 per hour from 2004 through September 2008. *See id.* (*citing* PX 9 ¶ 46). Based on this evidence,

the special master concluded that "the prevailing market rates in Cheyenne, for services comparable to those that Mr. Moxley performed in this case, by a lawyer of 'skill, experience, and reputation' comparable to those of Mr. Moxley, were $200 for the period 2004 through August 31, 2006, and $250 thereafter." *Id.*[3]

Following the methodology used by the Federal Circuit in *Avera* for determining whether the *Davis* exception to the forum rule applied, the special master compared the "appropriate" forum rate *"asserted"* by Mr. Moxley, $405.00 to $465.00, with the Cheyenne rates of $200.00 to $250.00. *Id.* (*citing* PX 25). The special master found that there was a "very significant difference" between the forum rate and the Cheyenne rate and therefore applied the *Davis* exception. *See id.* at *5 (awarding Cheyenne rates for Mr. Moxley and his associate counsel and paralegal).

Pursuant to 42 U.S.C. § 300aa–12(e)(1) and RCFC, App. B, Vaccine Rule 23, petitioners' timely motion filed on July 27, 2009, seeks review of the special master's award of $6,426.50 in attorneys' fees. The $3,456.39 award of costs is not challenged. Petitioners contend that the special master committed reversible error by discounting the sufficiency of the evidence submitted; calculating the amount of attorneys' fees awarded at local Cheyenne rates rather than at the higher District of Columbia forum rate; applying the *Davis* exception; and not calculating the forum rate based on the Laffey Matrix, which fixes rates for complex federal litigation in the District of Columbia. Respondent filed its response on August 25, 2009, arguing that the special master acted within his discretion and urges the court to sustain his award of fees. Respondent does not appeal the amount of attorneys' fees awarded by the

---

3. Mr. Moxley submitted three declarations. The first, Sworn Declaration of Robert T. Moxley, Aug. 15, 2006 (PX 9), originally was filed before another special master in *Avera.* The second, Sworn Declaration in Support of Petition for Reimbursement of Attorneys' Fees and Costs, Mar. 6, 2008 (PX 15), was filed in *Masias v. Sec'y of Health & Human Servs.*, No. 99–697V, 2009 WL 1838979 (Fed. Cl. Spec. Mstr. June 12, 2009), *aff'd*, No. 99–697V (Fed.Cl. Dec. 10,

2009), and is the template for the third, Sworn Declaration of Robert T. Moxley, Sept. 25, 2008 (PX 21). The special master did not mention the second declaration, although Mr. Moxley incorporated it in the declaration original to the instant case. The third, filed in the matter on review, incorporates the two earlier declarations, and thereby reflects Mr. Moxley's hourly rates charged to Wyoming clients for the type of federal litigation that he practices.

594

special master. The parties sparred with additional briefing through October 16, 2009.

On October 5, 2009, petitioners filed a Motion for Payment of Fees Awarded Below, requesting an immediate payment of the special master's $9,882.89 award of attorneys' fees and costs as an award of interim fees pending appeal. Respondent's opposition filed on October 13, 2009, contended that petitioners do not satisfy the standard justifying an award of interim attorneys' fees as established by the Federal Circuit in *Avera.* On October 20, 2009, the court issued an order stating that it would rule on petitioners' motion for interim attorneys' fees in connection with its decision on petitioners' original motion for review. After supplemental briefing concluded on November 3, 2009, the matters stand as fully briefed. The court thereby resolves two issues: first, whether the special master abused his discretion by awarding $9,882.89 in attorneys' fees and costs out of a total request of $14,558.89; and second, whether petitioners should be granted an award of interim attorneys' fees.

## DISCUSSION

### I. *Standard of review*

■ The Vaccine Act specifies three alternative courses of action available to the Court of Federal Claims in reviewing a special master's decision. The court may

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2).[4] The special master's findings of fact are reviewed under the deferential "arbitrary and capricious" standard. *See* 42 U.S.C. § 300aa–12(e)(2)(B);

4. The language of 42 U.S.C. § 300aa–12(e)(2) is identical in substance to RCFC, App. B, Vaccine

*de Bazan v. Sec'y of Health & Human Servs.,* 539 F.3d 1347, 1350 (Fed.Cir.2008); *Lampe v. Sec'y of Health & Human Servs.,* 219 F.3d 1357, 1360 (Fed.Cir.2000) (explaining that arbitrary and capricious standard is "particularly" difficult to satisfy when issue "turns on the weighing of evidence by the trier of fact"); *Munn v. Sec'y of Dep't of Health & Human Servs.,* 970 F.2d 863, 870 (Fed.Cir.1992) (noting that arbitrary and capricious standard is "well understood to be the most deferential possible"). The special master's conclusions of law are, however, reviewed *de novo. Saunders v. Sec'y of Dep't of Health & Human Servs.,* 25 F.3d 1031, 1033 (Fed.Cir.1994). Discretionary rulings by the special master are reviewed under the "abuse of discretion" standard. *Id.; see also Munn,* 970 F.2d at 870 n. 10.

■ The special master's determination of reasonable attorneys' fees and costs in a Vaccine Act case is a discretionary ruling that is entitled to deference from the United States Court of Federal Claims. *See Saxton ex rel. Saxton v. Sec'y of Dep't of Health & Human Servs.,* 3 F.3d 1517, 1521 (Fed.Cir. 1993) ("[F]ee determinations are within the discretion of the trial forum and are entitled to deference."); *Perreira v. Sec'y of Health & Human Servs.,* 27 Fed.Cl. 29, 34 (1992) ("The special master is afforded wide discretion in determining the reasonableness of costs, as well as attorneys' fees."), *aff'd,* 33 F.3d 1375 (Fed.Cir.1994). "If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y of Dep't of Health & Human Servs.,* 940 F.2d 1518, 1528 (Fed.Cir.1991).

### II. *Attorneys' fees awarded by the special master*

Under the Vaccine Act, a special master or the Court of Federal Claims may award "reasonable attorneys' fees" even if the petitioner is not awarded compensation, provided that the "petition was brought in good faith

Rule 27.

and there was a reasonable basis for the claim for which the petition was brought." 42 U.S.C. § 300aa–15(e)(1). The Federal Circuit mandates the use of the two-step lodestar method for determining the award of "reasonable attorneys' fees." *See Avera*, 515 F.3d at 1347 ("We have previously endorsed the use of the lodestar approach to determine what constitutes 'reasonable attorneys' fees' under the Vaccine Act.").

First, the court determines the lodestar, an initial estimate of reasonable attorneys' fees. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The court calculates the lodestar by determining "the number of hours reasonably expended on the litigation" and multiplying it by a "reasonable hourly rate." *Id.* The burden is on the fee applicant to establish the lodestar. *See Blum v. Stenson*, 465 U.S. 886, 895–96 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Second, following determination of the lodestar, the court "may then make an upward or downward departure to the fee award based on other specific findings." *Avera*, 515 F.3d at 1348. A reasonable hourly rate is " 'the prevailing market rate,' defined as the rate 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.' " *Id.* (*quoting Blum*, 465 U.S. at 896 n. 11, 104 S.Ct. 1541).

The Federal Circuit held in *Avera* that, to determine the prevailing market rate for purposes of the Vaccine Act, the court should use "the forum rate in the lodestar calculation." *Id.* at 1349. Under the forum rate (or forum rule) the court utilizes the prevailing market rates in the District of Columbia forum where the Court of Federal Claims is located. *See id.* at 1346. However, in *Avera* the Federal Circuit also adopted the *Davis* exception to the forum rule "in Vaccine Act cases in which the bulk of [an attorney's] work is done outside of the District of Columbia in a legal market where the prevailing attorneys' rates are substantially lower." *Id.* at 1349. If the court invokes the *Davis* exception, the court applies the prevailing market rate in the community where the bulk of the work was performed. *See id.* at 1350. Here, petitioners challenge the special

master's application of the *Davis* exception to the forum rate for attorneys' fees.

The linchpin of Mr. Moxley's argument is that a separate market in Wyoming exists for complex federal litigation, which Cheyenne attorneys bill at a higher rate than they do for "local" practices; he enjoins the court to award District of Columbia forum rates using the Laffey Matrix. He argues that *Avera* was factually mistaken when it compared local rates for state practice to District of Columbia rates, rather than applying rates in Cheyenne for "complex federal litigation," which bills at rates commensurate with the District of Columbia. However, as the special master recognized, Mr. Moxley made this precise argument to the Federal Circuit in *Avera*—namely, that Vaccine Act cases constitute complex federal litigation. *See Avera*, 515 F.3d at 1346 ("In the amended petition, appellants argued that, given counsel's long experience practicing in the Vaccine Act Program, the special master should use the substantially higher rates in the so-called Laffey Matrix, utilized by the District of Columbia Circuit for counsel practicing in the District of Columbia *in the area of complex federal litigation.*" (emphasis added)). Yet, Mr. Moxley argues in the instant subject that the issues presented are *sui generis* from *Avera*, and he "urge[s]" this court to make independent factual and legal determinations.

■ Petitioners charge that the special master abused his discretion by improperly rejecting the testimony of Vaccine Act and non-Vaccine Act attorneys. Specifically, the special master is cited for rejecting the affidavit provided by Mr. Schultz, a non-Vaccine Act attorney, because Mr. Schultz provided insufficient detail. "The master … would not ascribe sufficient skill and reputation to petitioners' counsel in order to accept the competent opinion testimony of Donald I. Schultz, Esq." Pet'rs' Br. filed Sept. 4, 2009, at 5. Petitioners argue that Mr. Schultz "reasonably relied" on sworn statements from Vaccine Act practitioners attesting to Mr. Moxley's skill and reputation, evidence that the special master deemed not to be significant. *See* Pet'rs' Br. filed Sept. 04, 2009, at 9. Respondent asks the court to affirm because the special master acted within his

discretion in according Mr. Schultz's affidavit little weight.

Petitioners' analysis of the special master's decision is not accurate. The special master was not attempting to "quantify the skill, experience, and reputation of *petitioners' counsel*," in weighing the proffer of Mr. Schultz. *Id.* (emphasis added) (internal quotation omitted). Rather, the special master was seeking to determine whether the "prevailing market rate" in Cheyenne for Vaccine Act practitioners was comparable to the forum rate of the District of Columbia, as required by *Blum* and *Avera.* The special master correctly noted that the facts and most of the evidence submitted by petitioners in the instant case essentially were identical to the showings considered by the Federal Circuit in *Avera.* Both cases were litigated by Mr. Moxley, who argues the same legal theory, and who performed all of his work in Cheyenne for both *Avera* and the instant case. Assuming, *arguendo,* that a separate market exists in Cheyenne for complex federal litigation—an assumption not reached by the Federal Circuit in *Avera,* 515 F.3d at 1350—Mr. Moxley still must put forward sufficient evidence to establish what those rates are. The only evidence offered by Mr. Moxley that speaks to actual market rates charged for comparable legal work are the affidavit of Mr. Schultz and Mr. Moxley's own declarations.

The other sworn statements of attorneys presented to the special master had been submitted in *Avera* and in *Masias v. Sec'y of Health & Human Servs.,* No. 99–697V, 2009 WL 1838979 (Fed. Cl. Spec. Mstr. June 12, 2009), *aff'd,* No. 99–697V (Fed.Cl. Dec. 10, 2009), and were offered to support the proposition that the Vaccine Act constitutes complex federal litigation, a question on which the Federal Circuit declined comment in *Avera.* Petitioners insist that the special master "was *required* to address the sworn testimony . . . . uttered by eight attorneys." Pet'rs' Br. filed July 27, 2009, at 2–3 (emphasis added). This interpretation of the special master's review of petitioners' evidence is absurd. The special master only must consider evidence that is "relevant and reliable." RCFC, App. B, Vaccine Rule 8(b)(1). Mr.

Schultz admitted that his knowledge about the "vaccine injury practice" comes from his review of three affidavits submitted by attorneys in the *Masias* and *Avera* cases. *See* Affidavit of Donald I. Schultz, Apr. 3, 2008, ¶ 7 (PX 22). Mr. Schultz asserts that he has "personal knowledge of hourly billing rates in the range of $375 to $405 per hour being charged currently to, and paid regularly by, private clients of Cheyenne, Wyoming and Jackson, Wyoming litigation attorneys who have experience akin to Mr. Moxley's, and who are billing for their services in complex litigation matters pending in the District of Wyoming." Schultz Aff. ¶ 8. This is the extent of the evidence on fees actually charged other than Mr. Moxley's statements of his rates and the assertions by one declarant in *Avera* that Vaccine Act work should command an hourly rate of "several hundred dollars per hour." Sworn Declaration of Gary L. Shockey, Apr. 12, 2006, ¶ 13 (PX 10) (explaining reasons his firm discontinued its Vaccine Act practice, including insufficient fees paid and increased adversarial litigation) (submitted before the special master in *Avera* ).

Petitioners argue that *Willis v. United States Postal Service,* 245 F.3d 1333, 1341 (Fed.Cir.2001), supports their contention that Mr. Schultz's affidavit constitutes satisfactory evidence of rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum,* 465 U.S. at 896 n. 11, 104 S.Ct. 1541. In *Willis* the Federal Circuit reviewed a Merit System Protection Board (the "MSPB") determination that an applicant for a fee award failed to submit sufficient evidence to establish that the attorneys' fees sought were prima facie reasonable under 5 U.S.C. § 7701(g)(1) (1994). *Id.* at 1335. In that case the evidence submitted to show that the fee charged by a Fort Collins, Colorado law firm was consistent with the prevailing forum rates found in Charleston, West Virginia, included the petitioners'

representation contract specifying the rate sought; . . . affidavits from both of her non-local attorneys stating that they contracted with and billed her at their customary rates, and that these rates were "average" for Charleston . . . and . . . three

previous decisions by the Board holding that these rates charged by the same firm that had represented Willis, were reasonable in similar appeals in three other communities.

*Id.* at 1335. The MSPB concluded that the petitioner submitted no relevant evidence and reduced the rate sought. *Id.* at 1336. On appeal the Federal Circuit found reversible error in the MSPB's failure to consider the attorney contract and the three prior decisions and its conclusion that the affidavits alone were insufficient to establish a local rate. *See id.* at 1340–41. The court held:

> We discern no requirement either for corroborating affidavits from local attorneys or others, or that the attorneys' affidavits must set forth the underlying factual bases or sources for their assertions equating the contract and community rates. Such an attorney-affiant should be presumed to be knowledgeable and truthful unless and until he is shown to be otherwise.

*Id.* at 1341. However, the court observed that the "attorney affidavits here do not contain assertions regarding issues about which the attorney cannot be presumed to have direct knowledge such as ... the level of skill of the ordinary practitioner in a particular field of technology. Rather, they contain assertions regarding the attorneys' own customary rates." *Id.* at 1341 n. 2. The court also limited its holding to the facts presented in that case. *See id.* at 1341 ("We therefore deem it unnecessary, at least on the record in this case, for the [attorneys'] affidavits to include factual bases in support of their assertions, even though they are non-local attorneys.").

Based on this precedent, the court finds that it was an abuse of discretion for the special master to require Mr. Schultz's affidavit to specify the rates at which Mr. Schultz bills himself and to require disclosure of the names, legal experience, and reputation of the attorneys of whom Mr. Schultz claims personal knowledge and who bill at higher rates for complex federal litigation in Cheyenne. However, the court affirms on other grounds the special master's determination that Mr. Schultz's affidavit was insuffi-

cient evidence to establish the Cheyenne rates for Vaccine Act practice. Mr. Schultz reviewed three of the eight non-Moxley attorney affidavits and "gather[s] from that testimony that vaccine injury practice is fairly to be termed 'complex federal litigation.'" Schultz Aff. ¶ 7. Mr. Schultz provided no personal knowledge of the comparability of the Vaccine Act to other complex federal litigation. While sworn statements from attorneys other than Messrs. Moxley, Schultz, and Shockey attest to the complexity of Vaccine Act practice, they offer no support for rates charged in Cheyenne for comparable work other than what Messrs. Moxley and Shockey charged in 2006; while Mr. Schultz supports a current and higher rate, his comparability opinion is based on other attorneys' opinions. In these circumstances this court holds that the special master did not abuse his discretion in not crediting Mr. Schultz's evidence to determine the rates charged by Cheyenne attorneys for comparable complex federal litigation. The special master had reasonable grounds for finding Mr. Moxley's own declarations ultimately more persuasive than Mr. Schultz's affidavit. *Accord Masias v. Sec'y of Health & Human Servs.*, No. 99–697V, slip op. at 11 (Fed.Cl. Dec. 10, 2009).

### III. *Interim fees*

On October 5, 2009, petitioners filed a Motion for Payment of Fees Awarded Below. Petitioners argue that because *Avera* held that interim attorneys' fees may be awarded under the Vaccine Act's provision for reasonable attorneys' fees, *see* 515 F.3d at 1351, and because respondent did not appeal the $9,882.89 in fees awarded by the special master, the special master's award constitutes a binding judgment to which petitioners are entitled, *see* Pet'rs' Br. filed Oct. 5, 2009, at 1–2. Respondent demurs that payment of the special master's award cannot be made absent the entry of a judgment, which petitioners' appeal of the special master's attorneys' fee decision prevents. Respondent also argues that *Avera* permits an award of interim attorneys' fees only when certain standards are met, and petitioners have not done so.

The Federal Circuit in *Avera* held that the Vaccine Act authorizes an award of interim attorneys' fees. "There is nothing in the Vaccine Act that prohibits the award of interim fees." *Avera*, 515 F.3d at 1351. However, given the facts presented in *Avera*, the Federal Circuit found "no basis" to award interim fees. *Id.* at 1352. The court observed that an interim fee award is "particularly appropriate" when there are protracted proceedings and "costly experts must be retained." *Id.* The court affirmed denial of an interim fee award in *Avera* where the petitioner only sought interim fees pending appeal and made no showing that would "justify an award of interim fees during that pendency." *Id.* Under such circumstances fees will be denied when a petitioner fails to demonstrate that he has suffered undue hardship: the amount of fees sought is not substantial; no experts were employed; and only a short delay in the award transpires pending the appeal. *See id.*

Petitioners counter that *Avera* did not hold that these factors must be established to support an interim fee award and that any language limiting an interim award was "obiter dictum." *See* Pet'rs' Br. filed Oct. 16, 2009, at 5.[5] Petitioners instead construe *Avera* as holding that interim attorneys' fees are a part of the Vaccine Act and should be awarded whenever respondent does not dispute any amount of a special master's fee award, which petitioners describe as a "vested property right." Pet'rs' Br. filed Oct. 16, 2009, at 8. Nevertheless, upon instruction by the court, *see* Order entered Oct. 6, 2009, petitioners attempted to satisfy the *Avera* factors. The court is not persuaded.

Petitioners argue that the "proceedings are protracted" by virtue of procedural delay built into the Vaccine Act itself. *See* Pet'rs' Br. filed Oct. 16, 2009, at 13 (noting "the statutory protraction in this matter"). Peti-

tioners submit that the appellate court in *Avera* was factually mistaken when it stated that "there was only a short delay in the award pending appeal." *See id.* (*quoting Avera*, 515 F.3d at 1352). Petitioners contend further that "substantial and real" hardship is caused by "routine delay in payment occasioned by the review procedures of the Act itself." *Id.* at 8. Mr. Moxley cites a myriad of personal and professional difficulties that he attributes to an "oppressive fees doctrine" imposed upon him by the Office of Special Masters and Court of Federal Claims, which thwarts his ability efficiently to collect attorneys' fees at the hourly rates that he seeks. For example, Mr. Moxley states that his prior law firm, Gage & Moxley, was forced out of business in 2006 as a result of the Vaccine Act "Program's fees doctrines." *Id.* at 14. Mr. Moxley, as a consequence, is now a sole practitioner. Affidavit of Robert T. Moxley, Oct. 16, 2009, ¶ 13. Petitioners submit that, contrary to the findings in *Avera* that $12,073.77[6] in attorneys' fees and costs was not a substantial amount, the $9,882.89 fee awarded by the special master is a substantial sum.

■ This court agrees with the special master that the "result in this case follows directly from the outcome in *Avera*." *Avila II*, 2009 WL 2033063, at *2. The reasons proffered by petitioners do not satisfy the *Avera* factors justifying an interim fee award. The merits of petitioners' Vaccine Act compensation claim are not the subject of this appeal—only the hourly rates for attorneys and a paralegal. While petitioners did consult with one expert, Dr. Kinsbourne, no expert report was ever filed, and no testimony taken from him. Proceedings in this case have not been protracted. Hearings on compensation were never held. In *Avera* the Federal Circuit found that $12,073.77 awarded in attorneys' fees and costs was not sub-

---

5. In an Affidavit in Support of Motion for Payment of Awarded Fees, Mr. Moxley asks the court to "re-examine the assertions of the Federal Circuit in *Avera* where it upheld denial of interim fees, stating that 'the amount of the fees here was not substantial; appellants had not employed any experts; and there was only a short delay in the award pending the appeal.'" Affidavit of Robert T. Moxley, filed Oct. 16, 2009, ¶ 4 (*quoting Avera*, 515 F.3d at 1352). To the

extent Mr. Moxley asks the court to jettison factors deemed relevant by the Federal Circuit, the court may not do so.

6. *See Avera v. Sec'y of Health & Human Servs.*, 75 Fed.Cl. 400, 401 (2007) ("The Special Master awarded petitioners $12,073.77 for attorneys' fees, costs, and personal expenses[.]").

stantial. This court likewise finds that the $9,882.89 fee awarded below—a lesser sum—is not substantial. Last, petitioners have failed to satisfy their burden of showing "undue hardship" that would justify an award of interim attorneys' fees. The lengthy litany of complaints about the "injustice" done to Vaccine Act practitioners as a result of decisions reached in prior attorneys' fee cases is irrelevant to showing any undue hardship sustained during the course of litigation in this case.

Petitioners argue that the court should adopt Judge Williams' reasoning in her recent decision *Doe/11 v. United States*, 89 Fed.Cl. 661, 662–63 (Fed.Cl.2009), which held the special master abused his discretion by denying interim attorneys' fees. Because *Doe* is factually distinguishable from this case, the court declines to do so.

Unlike the instant case where petitioners did not file an interim fee request before the special master and the hourly rates for attorneys and a paralegal are the only matters on appeal, in *Doe* petitioners' filed their interim fee request with the special master, a request which complemented their ongoing appeal to the Federal Circuit of the Court of Federal Claims' dismissal of their Vaccine Act petition. *See Doe*, 89 Fed.Cl. at 663–64. Judge Williams found that *Avera* was satisfied because the compensation petition originally was filed on April 8, 1999, and that protracted proceedings on the merits involved the testimony of four experts before the special master and the Court of Federal Claims. *See id.* at 666–67.

The court determines that an award of interim attorneys' fees ultimately is not justified when the amount of the fees is the only matter being appealed. The court also declines to award interim attorneys' fees because petitioners have failed to meet all the standards established by the Federal Circuit in *Avera*. While petitioners did briefly consult with an expert, proceedings were not protracted, and the amount of fees sought is not substantial. Therefore, the court denies petitioners' request for interim attorneys' fees.

IV. *The legal context framing the special master's decision*

In exercising its review function, the court has not conveyed the rancor of the parties' advocacy before the special master or the Court of Federal Claims. Mr. Moxley is on a mission to relieve Vaccine Act attorneys from the penury to which he complains that the Office of Special Masters and the courts have consigned them by rebuffing their fee applications and thereby belittling the value of their advocacy on behalf of Vaccine Act petitioners.[7] Respondent parries with assertions that Mr. Moxley has exploited the attorneys' fees provision of the Vaccine Act.

In fact, Mr. Moxley supplies the reason for the vexatiousness of Vaccine Act attorneys' fee awards: "Congress chose to subsidize Vaccine Program litigation with reasonable attorneys' fees." Pet'rs' Br. filed Oct. 16, 2009, at 4. This feature of the Vaccine Act was unprecedented and remains unique.

Under the Vaccine Act, a party need not prevail for an award of attorneys' fees or a full reimbursement for expert witness fees. Congress enacted this subsidy because liability under Vaccine Act cases was not predicated on fault. *See* H.R.Rep. No. 99–908, at 3 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 6344, 6344. Precisely because causation could rarely be proved under conventional tort law in state or federal court, the Vaccine Act stepped in to allow recovery without proof of causation for certain injuries deemed vaccine-related and listed on a Vaccine Injury Table, 42 U.S.C. § 300aa–14(a), *amended by* 42 C.F.R. § 100.3 (2009). Causation was presumed, *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed.Cir. 2005), and the Vaccine Act statutorily prohibited application of the Federal Rule of Evidence:

> Such rules [to be adopted by the Court of Federal Claims] shall—

---

7. Mr. Moxley complains that "[t]here has **never** been a reasonable fee award, predicated on a correct view of federal law, in Program histo- ry.... The system is unfair; its systemic damage to the rights of petitioners is unconscionable." Pet'rs' Br. filed July 27, 2009, at 11.

(A) provide for a less-adversarial, expeditious, and informal proceeding for the resolution of petitions,

(B) include flexible and informal standards of admissibility of evidence,

. . . .

(D) include the opportunity for parties to submit arguments and evidence on the record without requiring routine use of oral presentations, cross examinations, or hearings, and

(E) provide for limitations on discovery and allow the special masters to replace the usual rules of discovery in civil actions in the United States Court of Federal Claims.

42 U.S.C. §§ 300aa–12(d)(2)(A)–(E); *see also Hines ex rel Sevier v. Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 1518, 1525 (Fed.Cir.1991).

The Vaccine Act always has afforded petitioners an opportunity to prove causation-in-fact for injuries that were not included as Table injuries or injuries that did not occur within the specified time frame. *See* 42 U.S.C. §§ 300aa–11(c)(1)(C)(ii), –13(a)(1)(A). This category of cases, however, did not fuel the litigation crisis that the Vaccine Act attempted to ameliorate in 1988. The Vaccine Act's legislative history makes Congress' intent clear:

> The bill establishes a compensation system for those persons injured by routine pediatric vaccines. The system is intended to be expeditious and fair. It is also intended to compensate persons with recognized vaccine injuries *without requiring the difficult individual determinations of causation of injury* and without a demonstration that a manufacturer was negligent or that a vaccine was defective.

H.R.Rep. No. 99–908, at 12, 1986 U.S.C.C.A.N. p. 6353 (emphasis added). Moreover, the causation-in-fact cases did not set the benchmark for the evidentiary show-

ing that was intended for Vaccine Injury Table cases: "The Vaccine Act does not contemplate full blown tort litigation in the Court of Federal Claims." *Knudsen v. Sec'y of Dep't of Health & Human Servs.*, 35 F.3d 543, 549 (Fed.Cir.1994). *See generally* H.R.Rep. No. 99–908, at 4, 1986 U.S.C.C.A.N. pp. 6344–45 (describing costs of excessive litigation and Vaccine Act's intent to divert petitioners from traditional litigation).

The attorneys' fees subsidy allowed this relaxed-standard Vaccine Injury Table litigation to be prosecuted. However, two developments have intervened that Congress neither contemplated nor addressed: 1) the U.S. Supreme Court in 1993 issued its opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), five years after the Vaccine Act was passed, a seminal case that established minimum standards for admissible scientific evidence in cases tried in federal courts;[8] and 2) the Vaccine Act practice became dominated by cases that seek to prove causation-in-fact, not cases that seek recovery for a Vaccine Table Injury. The ensuing case law has attempted to impart some discipline to the medical/scientific showing in support of causation-in-fact, while maintaining a relaxed form of litigation.

The practical reality is that the Vaccine Act will compensate attorneys and expert witnesses for adversarial proceedings requiring a level of proof far different from the Vaccine Act's original contemplation. Mr. Moxley's fellow Vaccine Act attorneys' fees applicant, Clifford J. Shoemaker, in his affidavit submitted before the special master in *Masias,* captured the unforeseen shift in the type of cases covered under the Vaccine Act:

> 3. I have practiced in the National Vaccine Injury Compensation Program since its inception. Early on in the Program the cases went relatively smoothly, with rough-

---

**8.** In *Liquid Dynamics Corp. v. Vaughan Co.,* 449 F.3d 1209, 1220–21 (Fed.Cir.2006), the Federal Circuit explained the test enunciated in *Daubert:*

> In *Daubert,* the Supreme Court set forth four factors for district courts to consider when evaluating the validity and relevance of scientific evidence pursuant to Rule 702 of the Feder-

al Rules of Evidence. These factors include (1) whether the methodology can and has been tested, (2) whether the methodology is subject to peer review, (3) the potential rate of error, and (4) the general acceptance of the methodology.

*Id.* (citations omitted).

ly 90 percent of the cases fall[ing] on the Table of Injuries.

4. Following the administrative changes to the Table in 1996, the whole tenor of the Program changed and the ratio of Table/Non–Table cases reversed. The vast overwhelming majority of the cases in the Program now proceed as causation-in-fact cases requiring expert opinions on causation. As a result the adversarial nature of the cases has increased dramatically.

5. The Program has now become a situation where you can have four separate litigations within one case. You can first have an onset hearing to determine the onset of a condition involving fact witnesses and conflicts with medical records. Next you would have a full-blown hearing on causation. And here, depending on the issues involved there can be up to five or six experts involved. There are arguments over whether the proper expert for a rheumatological condition is a rheumatologist or an immunologist or both. There have been times when petitioner offered an immunologist and the Respondent offered a rheumatologist and counsel was instructed *by the special master* to get a Rheumatologist to counter the testimony of the Respondent's experts. If a question arises during the course of the hearing about the written statements of a treating doctor, there may be another round of briefing regarding that issue. Special Masters may then order multiple rounds of post-hearing briefing. If petitioner is fortunate enough to prevail, the case enters the damages phase, at which point another full blown hearing may occur. Ultimately, after the first compensation check is in the hands of the Petitioner, I file my application for attorney's [sic] fees and costs and in nearly every case is [sic] met with opposition from Respondent. Multiple rounds of briefings, status reports and status conferences can also ensue.

Affidavit of Clifford J. Shoemaker, Apr. 8, 2008, ¶¶ 3–5 (footnote omitted) (submitted as PX 19 before the special master).

Another of petitioners' declarants described the transformation of Vaccine Act litigation:

In different terms, it took as much or more work to maintain an action in the Program—and do the best job possible— as it did to pursue a conventional civil case, handled on a contingency fee basis. All this occurred in an environment which had been represented, initially, as akin to a no-fault system. After the number of claims exceeded expectations and initial funding waned, the initial concept of the Program gave way to contested, unfriendly, adversarial proceedings in which Government attorneys (and, sometimes, special masters) assumed roles similar to the most obstreperous defense counsel, in which fees claims were likely to be contested, and in which the amount of work necessary to prosecute a claim under the program rivaled the amount for work necessary to pursue an "ordinary" civil claim for catastrophic injury.

Shockey Decl. ¶ 5.

The Vaccine Act requires that a petitioner seeking to establish an off-Table injury prove his/her case to the special master by "a preponderance of the evidence":

Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition ..., and

(B) that there is not a preponderance of the evidence that the illness ... is due to factors unrelated to the administration of the vaccine....

42 U.S.C. § 300aa–13(a)(1). The Federal Circuit in *Althen* set forth the evidentiary standard of proof that must be met in order to establish causation-in-fact:

This court has interpreted the "preponderance of the evidence" standard referred to in the Vaccine Act as one of proof by a simple preponderance, of "more probable than not" causation.... [The Government's attempt to raise the burden by requiring confirmation of medical plausibility] prevents the use of circumstantial evi-

dence envisioned by the preponderance standard and negates the system created by Congress, in which close calls regarding causation are resolved in favor of injured claimants.... [T]he purpose of the Vaccine Act's preponderance standard is to allow the finding of causation in a field bereft of complete and direct proof....

418 F.3d at 1279–80. In order to satisfy the preponderance standard in cause-in-fact cases, a petitioner must furnish evidence showing: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between the vaccination and injury." *Id.* at 1278.

The Vaccine Act allows proof in the form of medical records or medical opinions. 42 U.S.C. § 300aa–13(a)(1). The Federal Circuit's formulation in *Althen* requires a petitioner to support his theory of causation "by reputable medical or scientific explanation, *i.e.*, evidence in the form of scientific studies or expert medical testimony." *Althen,* 418 F.3d at 1278 (internal quotation marks omitted); *see also Capizzano v. Sec'y of Health & Human Servs.,* 440 F.3d 1317, 1324–27 (Fed. Cir.2006) (applying the *Althen* test). In keeping with Congress's intent that Vaccine Act cases not devolve into "full-blown tort litigation," *Knudsen,* 35 F.3d at 549, this standard does not adopt *Daubert.* It attempts to negotiate between relaxed rules of evidence that are *sui generis* to Vaccine Act proceedings—based on a definition of a medical theory that predated *Daubert, see Grant v. Sec'y of Health & Human Servs.,* 956 F.2d 1144, 1148 (Fed.Cir.1992) (requiring "a medical theory causally connecting the vaccination and the injury")—and the requirement that causation-in-fact was equated with " 'legal cause' in the general torts context," *de Bazan,* 539 F.3d at 1351 (*quoting Shyface v. Sec'y of Health & Human Servs.,* 165 F.3d 1344, 1352 (Fed.Cir.1999)). As reiterated in *Althen:*

> Bring the case within the timetable and specifications of a Table Injury and the statute does the heavy lifting—causation is conclusively presumed. Failing that, the heavy lifting must be done by the petitioner, and it is heavy indeed. Given the statutory burden of persuasion placed upon the petitioner, 42 U.S.C. § 300aa–13(a)(1) ... it is not surprising that petitioners have a difficult time proving [off-Table cases].

418 F.3d at 1280 (omission in original) (alteration in original) (*quoting Hodges v. Sec'y of Health & Human Servs.,* 9 F.3d 958, 961 (Fed.Cir.1993)).

■ Under the Vaccine Act, causation must be supported by a " 'reputable medical or scientific explanation,' " and the special master may assess "the relevant scientific data." *Andreu v. Sec'y of Health & Human Servs.,* 569 F.3d 1367, 1379–80 (Fed.Cir.2009) (*quoting Althen,* 418 F.3d at 1278). Yet, "[m]edical literature and epidemiological evidence must be viewed, however, not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard," which is not " 'scientific certainty.' " *Id.* at 1380 (*quoting Bunting v. Sec'y of Health & Human Servs.,* 931 F.2d 867, 873 (Fed.Cir.1991)).

The Court of Federal Claims at present is considering amending the Vaccine Rules of the United States Court of Federal Claims. The Federal Rules of Evidence or Fed. R.Evid. 702 standard, as fully informed by *Daubert,* will not be applied because the Vaccine Act countermands adoption of customary rules of evidence, 42 U.S.C. § 300aa–12(d)(2)(A)–(E). Nonetheless, the complexity of Vaccine Act cases has been ramped-up to an extent far beyond what Congress envisioned as a Vaccine Act that subsidized attorneys and experts for presenting no-fault claims. As suggested by the Federal Circuit in *Henderson v. Shinseki,* 589 F.3d 1201, 1219–20 (Fed.Cir.2009) (Dyk, Gajarsa & Prost, JJ., concurring), the problems with implementing a statute that develops over time suggest that Congress may assess that amendment of the Vaccine Act is in order.

## CONCLUSION

Based on the foregoing, Petitioners' Motion for Review of the Special Master's Decision of June 26, 2009, and Petitioners' Motion for Payment of Fees Awarded Below are

denied. The Clerk of the Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

No costs on review.